# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

In the Matter of Charles Joseph Webb, Respondent.

Appellate Case No. 2024-000779

---

Opinion No. 28237
Submitted August 27, 2024 – Filed September 18, 2024

---

## DISBARRED

---

Disciplinary Counsel William M. Blitch, Jr., and
Assistant Disciplinary Counsel Jeffrey Ian Silverberg,
both of Columbia, for the Office of Disciplinary Counsel.

Barbara Marie Seymour, of Clawson & Staubes, LLC, of
Columbia, for Respondent.

---

**PER CURIAM:**   In this attorney disciplinary matter, Respondent and the Office
of Disciplinary Counsel (ODC) have entered into an Agreement for Discipline by
Consent (Agreement) pursuant to Rule 21 of the Rules for Lawyer Disciplinary
Enforcement (RLDE) contained in Rule 413 of the South Carolina Appellate Court
Rules (SCACR).  In the Agreement, Respondent admits misconduct and consents
to the imposition of a three-year definite suspension or disbarment, along with
other conditions of discipline.  We accept the Agreement and disbar Respondent
from the practice of law in this state.  The facts, as set forth in the Agreement, are
as follows.

## I.

After working at a law firm for many years practicing real estate law, Respondent
opened a solo practice handling real estate matters in February 2020.  Respondent
hired his long-time paralegal from his prior law firm to work for him as his real
estate paralegal and his only employee.  When Respondent first established his
solo practice, he opened a trust account to handle real estate closings (Real Estate

Account).  Respondent gave his paralegal access to the Real Estate Account and had her prepare the monthly reconciliations for this account.  No funds deposited into the Real Estate Account were misappropriated.

On March 31, 2021, Respondent opened another trust account (Trust Account).  According to Respondent, he opened this account for the purpose of holding retainers or other funds in escrow for clients in matters that did not involve his firm serving as the closing attorney on a real estate matter.  Respondent did not provide his paralegal any access to the Trust Account, and Respondent did not prepare any monthly reconciliations for this account.  Respondent's paralegal offered to help Respondent with reconciling the Trust Account, but Respondent declined.

Shortly after opening the Trust Account, Respondent made multiple improper transfers between this account and his firm's operating account.  For example, on May 10, 2021, the Trust Account received a wire in the amount of $114,352 to hold in escrow.  On May 12, 2021, Respondent transferred $4,000 of these funds to his operating account.  On May 14, 2021, Respondent made a cash deposit to the Trust Account in the amount of $4,000—the same amount he previously transferred to the operating account.  On May 18, 2021, Respondent wired the full $114,352 to his client.  Respondent has no independent recollection of these transactions, but bank records indicate that Respondent used some or all of the $4,000 he transferred from the Trust Account for personal or business expenses and to conduct online sports gambling.  Although Respondent's client ultimately received the full amount of escrow funds, Respondent converted $4,000 of his client's funds for his personal use.

Similarly, on June 24, 2021, the Trust Account received a wire in the amount of $1,929 from an opposing party in a collection matter that Respondent was handling for a client.  On July 1, 2021, Respondent transferred the entire $1,929 to his operating account.  Eleven days later, he transferred $1,447 from his operating account to the trust account, an amount which represented the $1,929 minus a 25% attorney's fee, then wired the $1,447 to his collection client.  Respondent has no independent recollection of these transactions, but bank records indicate that Respondent used some or all of the $1,447 he transferred from the Trust Account for personal or business expenses and to conduct online sports gambling.  Although Respondent's client ultimately received the full amount of escrow funds, Respondent converted $1,447 of his client's funds for his personal use.

Respondent admits that on several occasions from May 2021 through mid-August 2021, he deposited real estate escrow funds into the Trust Account instead of the

Real Estate Account and then used those funds to either fund gambling activities or pay personal or business expenses. Respondent would then obtain a cashier's check in the same amount and deposit the funds into this Real Estate Account prior to the closing so that neither his paralegal nor any of the parties to the transaction had any knowledge of Respondent's actions.

On August 20, 2021, Respondent received a wire into the Trust Account in the amount of $284,150. This represented proceeds from the sale of real property in favor of Client A. Respondent was supposed to hold these funds in trust until Client A could locate and purchase another property in a Section 1031 exchange. However, Respondent admits that over the course of approximately seven months, he converted Client A's funds for his personal use, including to fund gambling activities and pay personal and business expenses. While Respondent eventually disbursed the $284,150 to Client A in March 2022, he did so, in part, by using $53,336 that was being held in the Trust Account for Client B. Respondent had received Client B's funds in March 2022 and should have immediately wired the funds to Client B. However, Respondent did not make a disbursement to Client B until June 13, 2022, after Client B inquired about the status of the funds. Respondent ultimately paid Client B, in part, with funds held in the Trust Account for other clients.

According to Trust Account bank records, Respondent also converted the following client funds being held in the Trust Account for his personal use, including to fund gambling activities or pay personal and business expenses[1]:

  i. $25,000 in earnest money from Client C deposited into the Trust Account on March 14, 2022;

  ii. $15,000 in earnest money from Client D deposited into the Trust Account on April 26, 2022;

  iii. $12,166.50 from Client E deposited into the Trust Account on April 29, 2022;

---

[1] Respondent did not maintain client ledgers for the clients whose funds were held in the Trust Account. Moreover, Respondent admits he "did a terrible job of keeping financial records." ODC has identified these misappropriations based on an investigation of the available financial records; however, this is not an exhaustive list of Respondent's misappropriations from the Trust Account.

iv. $25,000 in earnest money from Client F deposited into the Trust Account on May 24, 2022; and

v. $20,000 from Client G deposited into the Trust Account on June 6, 2022.

In addition to the above matters, Respondent specifically identified the following clients from whom he converted trust/client funds for his personal use:

i. $18,000 from Client H deposited into the Trust Account on July 6, 2022;

ii. $20,000 from Client I deposited into the Trust Account on August 11, 2022;

iii. $10,000 from Client J deposited into the Trust Account on August 23, 2022;

iv. $2,671 from Client K[2];

v. $100,000 from Client L[3]; and

vi. $1,500 from Client M.[4]

Thus, in addition to the $104,171 Respondent misappropriated from Clients K, L, and M, ODC has determined that in 2021 and 2022, Respondent transferred or

---

[2] These funds were never deposited into the Trust Account, but rather, were wired directly to a personal account.

[3] These funds were never deposited into the Trust Account, but rather, were wired directly to a personal account.

[4] Client M paid Respondent a retainer of $1,500 to file a petition in a probate matter; however, Respondent never filed the petition and ultimately converted these funds to his personal use.

withdrew from the Trust Account at least $564,930.[5]  Respondent cannot identify how much, if any, of these amounts represented legitimate attorneys' fees.

Additionally, Respondent admits that he did not prepare monthly reconciliations of the Trust Account, maintain client ledgers and other financial records as required by Rule 417, SCACR, or provide his bank with a written directive to notify ODC if any checks were presented against insufficient funds.

## II.

Respondent admits that his conduct as set forth above violated the following provisions of the Rules of Professional Conduct, Rule 407, SCACR: Rule 1.15(a) (requiring a lawyer to safeguard client funds and prohibiting comingling client funds with the lawyer's own funds); Rule 1.15(c) (requiring a lawyer to deposit unearned fees in trust and allowing withdrawal only as fees are earned); Rule 1.15(d) (requiring a lawyer to promptly deliver funds to a client or third person); Rule 1.15(h) (requiring a lawyer who maintains a trust account to file with each financial institution a written directive requiring the institution to report to ODC when any instrument drawn on the account is presented for payment against insufficient funds); Rule 8.4(a) (prohibiting violations of the Rules of Professional Conduct); and Rule 8.4(d) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation).  Respondent's conduct also violated the financial recordkeeping requirements in Rule 417, SCACR.

Respondent also admits his misconduct is grounds for discipline under the following Rules for Lawyer Disciplinary Enforcement, Rule 413, SCACR: Rule 7(a)(1) (providing a violation of the Rules of Professional Conduct is a ground for discipline); and Rule 7(a)(5) (providing conduct bringing the legal profession into disrepute or conduct demonstrating an unfitness to practice law is a ground for discipline).

In the Agreement, Respondent admits his wrongdoing, agrees to a three-year definite suspension or disbarment, and requests that his sanction be imposed retroactively to the date of his interim suspension.  As conditions of discipline, Respondent agrees to pay costs and restitution to the Lawyers' Fund for Client Protection and attend Legal Ethics and Practice Program (LEAPP) Ethics School

---

[5] This aggregate amount represents $89,630 in cashier's checks and cash withdrawals, $205,420 in transfers to Respondent's operating account, and $269,880 in transfers to Respondent's personal bank account.

and Trust Account School prior to seeking reinstatement or readmission.

Attached to the Agreement is an affidavit in mitigation in which Respondent explains that he has struggled with disordered gambling since 1999. Respondent stated that his gambling addiction escalated between 2014 and 2016, resulting in him taking out a number of mortgages and other personal loans and eventually declaring bankruptcy in 2016. As a result, Respondent sought counseling in Charlotte and Columbia, attended Gamblers Anonymous meetings, and "quit gambling for the most part" for approximately two years. Respondent explained that after he opened his own practice, the pressure of managing his personal and business finances triggered a gambling relapse. Respondent initially engaged in a cycle of converting funds from one client to repay another, and he was able to leverage his assets and borrow additional sums from friends and family members to replace all but $126,000 belonging to five clients. When it became evident he could no longer continue to borrow to cover these debts, Respondent self-reported his misconduct and was placed on interim suspension.[6] *In re Webb*, 438 S.C. 58, 882 S.E.2d 167 (2022).

Following his November 2022 interim suspension, Respondent enrolled in an intensive inpatient program at Algamus Gambling Recovery Center near Phoenix, Arizona. Since returning from inpatient treatment in January 2023, Respondent explains he has prioritized healthy activities as an ongoing way to support his recovery including weekly attendance at bible study and church; weekly zoom Gamblers' Anonymous meetings; bi-weekly sessions with his gambling addiction counselor; maintaining contact with Beth Padgett of Lawyers Helping Lawyers (LHL); spending time with his children, including coaching their basketball teams; playing tennis and working out; and working as Vice President of Operations with MJS, Inc., a homeowners association management company.[7] Respondent explains "my decisions and actions cost me my marriage, my law license, friendships, and significant time and experiences with my children. However, I am

---

[6] Respondent avers that after he was placed on interim suspension, he instructed the five clients to file claims with the Lawyers' Fund for Client Protection, which covered the full amount of losses for all but one client. Respondent states he borrowed $35,000 from his parents to cover the outstanding amount owed to the fifth client, so all clients have now been made whole.

[7] In the period of time between completing rehab in Arizona and being hired by MJS, Respondent drove for Uber full time. Respondent still works part time for Uber in an attempt to repay his debts and contribute to his family's expenses.

continuing to focus on the things that I can control and on moving forward in an honest and healthy lifestyle, for me and as an example to my children."

Attached to Respondent's affidavit in mitigation are numerous letters of recommendation. The first six letters from Respondent's friends, neighbors, and colleagues describe Respondent as a devoted father, loyal friend, and competent real estate practitioner. According to these letters, Respondent has been humbled and embarrassed by the events that have occurred, but he has remained transparent and forthcoming about his actions and gambling addiction, taking full responsibility and expressing sincere remorse for his actions and the harm he has caused. These letters also emphasize that Respondent has remained committed to his children throughout the dissolution of his marriage.

The seventh letter is from Beth Padgett, of LHL, who confirms Respondent is in full compliance with the terms of his one-year LHL monitoring agreement and that he is "well-established in early recovery." The last two letters are from Shirley Hoak, the certified gambling counselor Respondent has been seeing since being released from inpatient treatment in January 2023. In her May 2023 letter, Ms. Hoak explains that disordered gambling is now recognized as an addiction in the same way that alcohol and drug disorders are recognized and that she has met with Respondent via weekly tele-health appointments to address his gambling disorder. In her March 25, 2024 letter, Ms. Hoak confirms Respondent attended weekly sessions with her for the duration of 2023, that she still sees Respondent regularly, and that Respondent's "commitment to his recovery and his willingness to accept responsibility for the harm his gambling has done have been exemplary."

Although these mitigating circumstances do not, in any way, excuse Respondent's serious misconduct, we commend Respondent for the extensive efforts he has undertaken to address and rehabilitate his gambling addiction.

### III.

"This Court has never regarded financial misconduct lightly, particularly when such misconduct concerns expenditure of client funds or other improper use of trust funds." *In re Wern*, 431 S.C. 643, 649, 849 S.E.2d 898, 901 (2020) (citation and quotations omitted). In light of Respondent's admitted pattern of misconduct, we find disbarment is appropriate. *See In re Locklair*, 418 S.C. 467, 795 S.E.2d 9 (2016) (disbarring an attorney, retroactive to the date of his interim suspension, for misconduct that included, among other things, misappropriating client funds in multiple matters to finance his cocaine addiction); *In re Bosserman*, 298 S.C. 198,

379 S.E.2d 130 (1989) (disbarring an attorney for, among other things, misappropriating client funds to finance his cocaine and alcohol addiction). Accordingly, we disbar Respondent from the practice of law in this state, retroactive to November 10, 2022, which is the date of his interim suspension.

Within fifteen days, Respondent shall surrender his Certificate of Admission to the Practice of Law to this Court. Within thirty days, Respondents shall: (1) pay the costs incurred in the investigation and prosecution of this matter by ODC and the Commission on Lawyer Conduct; and (2) enter into a reasonable restitution agreement with the Commission to repay the Lawyers' Fund for Client Protection for all claims the Fund has paid on Respondent's behalf.

**DISBARRED.**

**KITTREDGE, C.J., FEW, JAMES, HILL and VERDIN, JJ., concur.**